**In re OVERLAND PARK MERCHAN-DISE MART PARTNERSHIP, L.P., a Kansas Limited Partnership, Debtor.**

**Bankruptcy No. 93–40090–11.**

United States Bankruptcy Court,
D. Kansas.

April 15, 1994.

Daniel J. Flanigan, David D. Ferguson, McDowell Rice & Smith, Kansas City, MO, for debtor.

E.P. Keiffer, Burke & Wright, P.C., Dallas, TX, for Kansas Public Employees' Retirement System.

John Foulston, Wichita, KS, United States Trustee.

## MEMORANDUM OF DECISION
## ON CONFIRMATION

JAMES A. PUSATERI, Chief Judge.

A confirmation hearing was held in this case on March 14 and 15, 1994. The debtor presented its case in support of confirmation of its plan and the Kansas Public Employees' Retirement System (KPERS) presented its case in opposition. The debtor is represented by Daniel Flanigan and David Ferguson of McDowell, Rice & Smith, Kansas City, Missouri. KPERS is represented by E.P. Keiffer of Burke & Wright, P.C., Dallas, Texas.

KPERS asserts a number of problems preclude confirmation of the plan: (1) some of the classifications of creditors are improper under 11 U.S.C.A. § 1122; (2) the impairment of one class is artificial so the class should not be held to be impaired under § 1124; (3) if the artificial impairment is ignored and the improper classification eliminated, no impaired class has accepted the plan as required by § 1129(a)(10); (4) the plan is not feasible as required by § 1129(a)(11); (5) the proposed interest rate and length of payout do not satisfy the cramdown requirements of § 1129(b)(2)(A)(ii) for KPERS' secured claim; and (6) the plan violates the absolute priority rule of § 1129(b)(2)(B)(ii) with respect to KPERS' unsecured claim.

## FINDINGS OF FACT

*Background Facts*

The debtor is a limited partnership which owns 36.706 acres of land located at 6800 West 115th Street in Overland Park, Johnson County, Kansas, on which a structure known as the Overland Park Merchandise Mart (the Mart) is situated. The Mart is a two-story building with 598,230 square feet of gross area. The first floor houses a 233,550 square foot wholesale gift mart leased to an unrelated entity named Amigo, a 60,000 square foot exhibition hall operated by the debtor, and a 36,600 square foot common area shared by Amigo and the exhibition hall. Until this bankruptcy case was filed, the lower level was a 268,710 square foot undeveloped shell with a dirt floor, no windows and minimal lighting. Since the filing, the debtor has finished 50,000 square feet of this level and rented it for use as what the parties call "back office" or "bullpen-type" office space; another 50,000 square feet has been partially finished.

In 1986, KPERS furnished $30,000,000 in long term financing for the Mart by purchasing a land-acquisition-and-construction loan from Wells Fargo Bank. KPERS has a 25-year, nonrecourse mortgage with a variable interest rate that cannot go below 10%. For a number of reasons, the Mart has never produced sufficient cash flow to service the minimum interest payment of $3,000,000 per year. To overcome the cash flow deficiencies, certain related entities and others who are alleged to be "insiders" under the Bankruptcy Code have contributed over $12,000,000 in loans to the debtor, primarily in order to service the debt to KPERS.

KPERS' prepetition claim of about $35,500,000 is partially secured and partially unsecured. Although the unsecured portion would be unenforceable outside of bankruptcy, § 1111(b)(1)(A) makes it allowable as though it were a recourse claim. The value of the Mart is $15,500,000. As of the date of the confirmation hearing, the debtor possessed $1,083,964.92 of KPERS' cash collateral, $315,064 of which was earmarked to pay real property taxes for the second half of 1993 and accrued real property taxes for the first three months of 1994. The debtor proposes to treat KPERS' claim as secured to the extent of $16,268,900 and unsecured for the balance. The unsecured portion of the claim is comprised of the prepetition principal, plus interest that accrued prepetition but was not paid, plus about $2,300,000 in prepetition real estate taxes which KPERS paid postpetition, minus the $16,268,900 secured portion. KPERS' unsecured claim totals about $21,500,000.

Under the debtor's plan, KPERS is to be paid, over twenty-five years, the amount of its secured claim plus 7.5% interest, or interest at a rate fixed by the Court based on the evidence presented about the discount rate that must be paid to give KPERS the present value of its secured claim. The post-

confirmation debtor is to be a limited partnership owned 75% by limited partners and 25% by a general partner; the prepetition partnership interests are to be terminated. For its unsecured claim, KPERS is to receive 60% of the limited partner share of the new debtor. The other unsecured creditors include trade creditors, related entities, and alleged insiders; they have been classified together, separate from KPERS' unsecured claim. They are to receive the remaining 40% of the limited partner share in the new debtor. The debtor contends all these unsecured claims are impaired. The 25% general partner share was to be sold at auction. To bid, an interested party had to deposit $100,-000 as evidence of its ability to enter into the bidding; $15,000 of this deposit was to be forfeited by any losing bidders or if the plan was not confirmed. Certain related entities and alleged insiders joined forces to make the only bid for the general partner share.

Amigo, the prime lessee of the Mart, has been placed in a class by itself. It owes the debtor certain rental payments it failed to make prepetition and the debtor owes it money for utility reimbursements. These claims are to be forgiven and Amigo's present lease is to be rejected. Upon confirmation, a new lease between Amigo and the new debtor will take effect. The debtor contends Amigo's claim is impaired.

The Court will state additional pertinent facts relevant to each issue immediately before discussing the issue.

## DISCUSSION AND CONCLUSIONS

### I. CLASSIFICATION

#### A. Additional Facts About Classification

The plan places KPERS' claim in one class but divides it into secured and unsecured portions and treats each separately. KPERS was allowed only one vote for both portions of its claim. As indicated, Amigo's claim is in a separate class, and all other unsecured claims are in a class together. Amigo's claim is subject to setoff and is the claim of a lessee, characteristics shared by no other claim. The prepetition Amigo lease is being rejected and, upon confirmation, will

be replaced by a new lease with substantial changes.

The debtor's plan provides for a net preference recovery of $375,881 from related and possible-insider entities. The auction of the general partner share produced a $100,000 bid, which the new debtor will receive if the plan is confirmed.

#### B. Discussion and Conclusions About Classification

■ Placing the secured and unsecured portions of KPERS' claim in the same class and giving them but one ballot is inappropriate. *In re E.I. Parks No. 1 Ltd. Partnership*, 122 B.R. 549, 557 (Bankr.W.D.Ark. 1990). This answer begs the greater question, however, whether KPERS' unsecured claim can be classified separately from the remaining unsecured claims. If it can, the fact that the secured and unsecured portions of the claim were included in the same class but treated differently, though a technical violation, would have no overall effect since KPERS would have voted against the plan in all classes in which its claims were put. KPERS' objection is based on the exclusion of the unsecured portion of its claim from the class that includes all the other unsecured claims against the debtor. Assuming for the moment that the unsecured portion of KPERS' claim can properly be placed in a different class than the other unsecured claims, the Court concludes that the technical violation of placing KPERS' secured and unsecured claims in a single class could be cured without renoticing the plan by merely deeming them to be in separate classes being treated just as the debtor had proposed to do with them in one class, because this change would have no real effect on any creditor. This leaves, of course, the more difficult question whether KPERS' unsecured claim can be placed in a class by itself.

■ Does the fact that KPERS' claim is nonrecourse have any effect on the classification of its unsecured claim? Though the majority of courts, particularly circuit courts, have answered this question in the negative, this Court believes those conclusions were based on erroneous assumptions. Instead, the Court agrees with the opposing view

expressed in *In re SM 104 Ltd.*, 160 B.R. 202 (Bankr.S.D.Fla.1993).

Analyzing this question requires a review of a number of sections of the Bankruptcy Code, including §§ 723, 1111, 1122, 1123(a)(4), 1129(a)(7) and 1129(b). The courts which have held that a plan cannot place an undersecured, nonrecourse claim in a different class than trade and other unsecured claims, for example, *In re Greystone III Joint Venture*, 995 F.2d 1274 (5th Cir. 1991), have usually assumed that § 1111 makes the undersecured claim of the formerly nonrecourse creditor equal to ordinary unsecured claims in priority and legal and other rights. 995 F.2d at 1278–79. Many of them have asserted that if § 1122(a) is construed to allow the separate classification of similar claims simply because it does not specifically prohibit it, § 1122(b) becomes superfluous. 995 F.2d at 1278. Finally, many of them have declared that separately classifying the unsecured portion of an undersecured claim disenfranchises the holder by making its vote of that claim meaningless. 995 F.2d at 1280. This analysis overlooks: (1) certain Code provisions that give the nonrecourse unsecured claim a different legal character than the other unsecured claims; (2) the function § 1122(b) serves and the literal meaning of the language in § 1122; and (3) the important effect an unsecured class's rejection of a plan has on confirmation even when all other classes have accepted it.

Though the *Greystone* court and others following its view can legitimately argue the different legal character of claims under state law becomes irrelevant in bankruptcy, they cannot legitimately ignore provisions that give them a different legal character under the Bankruptcy Code. With certain exceptions not applicable here, section 1111(b)(1)(A) gives an undersecured, nonrecourse creditor a recourse claim for the unsecured portion of its claim unless it elects to have its entire claim treated as secured pursuant to § 1111(b)(2). Although all undersecured creditors can elect to have their full claim treated as secured or treated as a

secured claim to the extent of the value of their collateral and unsecured for the balance, only a nonrecourse creditor is given the option of having an unsecured claim in chapter 11 that it would not otherwise have, either in chapter 7 or under state law.

The following summary of other Code provisions will make the Court's next step in reasoning easier to understand. Section 1122(a) expressly provides only that claims placed in the same class must be "substantially similar," not that substantially similar claims must be placed in the same class. Section 1123(a)(4) provides that all claims in a class must be treated the same unless the holder of a particular claim agrees to less favorable treatment. Section 1129(a)(7)(A)[1] provides that a plan must ensure that dissenting claimants in any impaired class, accepting or not, receive on account of their claims value that is not less than they would receive if the debtor were liquidated under chapter 7. Section 723(a) gives a chapter 7 trustee a claim against each general partner of a partnership debtor for the full amount needed to pay any unsecured, but not nonrecourse unsecured, claims which the estate is otherwise unable to pay. Section 1129(b)(1) permits a plan to be confirmed over the objection of a class of claims if the plan does not discriminate unfairly and is fair and equitable.

Study of these provisions and their interrelationship leads to the conclusion that a class containing both ordinary unsecured claims and nonrecourse unsecured claims must fail the tests established by § 1123(a)(4), § 1129(a)(7) and possibly § 1129(b)(1). Contrary to the assumption made in many court decisions, the rights of nonrecourse unsecured claimholders are not the same under the Code as those of recourse unsecured claimholders. The differences in their rights are illustrated by the following examples.

If the plan were a liquidating plan or one which paid less than 100% on the unsecured claims, §§ 723 and 1129(a)(7) combine to give general unsecured creditors the right to recover additional amounts from the assets of

---

1. Section 1129(a)(7)(B) applies only to undersecured creditors who have elected under § 1111(b)(2) to be treated as fully secured.

KPERS has not made that election, so the test established by § 1129(a)(7)(B) is not applicable to this plan.

general partners, but not to nonrecourse unsecured creditors. Thus, if they are placed in the same class, the requirement in § 1123(a)(4) that all claims in the class be treated the same unless holders of particular claims agree to accept less favorable treatment cannot be satisfied unless the recourse claimants agree to give up any extra amount their rights against the general partners entitle them to receive or the nonrecourse claimants agree to accept less than the other members of the class. If § 1123(a)(4) could be satisfied by forced equal treatment of these claims, the unsecured creditors with recourse would be deprived of the right given to them by §§ 723(a) and 1129(a)(7). Clearly, Congress could not have intended to create such an anomalous situation.

■ In this case, the estate would have about $375,000 in preference recoveries, assets which are free from any liens. Although courts have split on the question whether preference recoveries are covered by a secured creditor's prepetition lien, *compare In re Lease–A–Fleet, Inc.,* 152 B.R. 431, 438–39 (Bankr.E.D.Pa.1993) (*citing many cases on both sides of split but concluding the recoveries are free from such a lien*) and *In re Integrated Testing Products Corp.,* 69 B.R. 901, 904–05 (D.N.J.1987) (recoveries not covered by lien) with *In re Ellingsen MacLean Oil Co., Inc.,* 98 B.R. 284, 289–91 (Bankr. W.D.Mich.1989), this Court not only agrees with the holdings of *Lease–A–Fleet* and *Integrated Testing,* but believes the Tenth Circuit's decision in *In re First Capital Mortgage Loan Corp.,* 917 F.2d 424 (10th Cir. 1990), requires the Court to adopt that view. In *First Capital,* the Circuit ruled that funds the debtor had paid out of trust prepetition did not regain their trust status when the bankruptcy trustee recovered them as preferences. If KPERS' nonrecourse unsecured claim must be placed in the general unsecured class of claim holders, any plan which provides for the equal distribution of the preference recovery among members of this class, as required by § 1123(a)(4), would violate § 1129(a)(7) because KPERS would not have an unsecured claim in chapter 7 and so would not be entitled to share in the preference recovery. Again, such a plan could not

be confirmed without the acceptance of the recourse unsecured claimholders.

If the plan provided for something other than a distribution of the preference recovery fund to the recourse unsecured creditors, for instance, if it gave all the unsecured creditors an equity interest in and thus a share of the profits of the reorganized debtor, the recourse unsecured creditors could object that the plan violated § 1129(b)(1) because any equal distribution would not guarantee satisfaction of § 1129(a)(7), and so would not be fair and equitable. If the plan called instead for an initial distribution of the preference fund to the recourse unsecured creditors in order to guarantee them the indubitable equivalent of their § 1129(a)(7) guarantee, and then exclude them from future profit distributions until an amount equal to the initial distribution to them is made to the nonrecourse unsecured creditor, the nonrecourse creditor could complain of discriminatory treatment under § 1129(b)(1) and unequal treatment under § 1123(a)(4); the recourse unsecured creditors could also complain that distributing any profits to the nonrecourse unsecured creditor without giving them a share violated the same sections. Though the examples stated are not exhaustive, they demonstrate that nonrecourse unsecured claims and other unsecured claims are not substantially similar and so must be classified separately. *See SM 104 Limited,* 160 B.R. at 216–21.

The Court does not believe that reading § 1122(a) to allow similar claims to be placed in reasonably justified separate classes makes § 1122(b) superfluous. Section 1122(b) merely codifies pre-Code case law which allowed the creation of an administrative convenience class. *See, e.g., Brockett v. Winkle Terra Cotta Co.,* 81 F.2d 949 (8th Cir.1936). It makes possible the creation of a class of small unsecured claims that are paid in full in cash, *S.Rep. No. 989, 95th Cong., 2d Sess., 118, n. 26 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5904,* that might otherwise generate an objection of unfair discrimination under § 1129(b). Furthermore, read literally as an exception to subsection (a), which requires only that claims placed in a single class must all be substan-

tially similar, § 1122(b) would appear only to permit placing claims that are not substantially similar in a single administrative convenience class, not to address whether substantially similar claims must all be placed in the same class.

The concern expressed in *Greystone* and other cases that the vote of the unsecured claim which § 1111(b) gives to an undersecured nonrecourse creditor will be rendered meaningless if the claim is not classified with the other unsecured claims is also misguided. Separate classification cannot accurately be said to disenfranchise any claimholder, whose vote against the plan will then necessarily create a non-accepting class and relegate the plan proponent to seeking confirmation through cramdown under § 1129(b). Instead, joint classification of recourse unsecured creditors with the Code-created unsecured claim for a significantly undersecured nonrecourse secured creditor tends to disenfranchise the recourse unsecureds by allowing the undersecured creditor to control the class, and block consideration under § 1129(b) of a plan the recourse unsecureds may want to accept. Separate classification of the nonrecourse unsecured claim makes that claim's vote meaningless only if one assumes that: (1) § 1111(b) was intended to enable the nonrecourse creditor to preclude a class of otherwise recourse unsecured creditors from accepting a plan, at least when its § 1111(b) claim is large enough to control that class; and (2) its vote can serve no other purpose. Contrary to these assumptions, even if the undersecured creditor's § 1111(b) claim is separately classified and its secured claim is not impaired by the plan, the vote given to the § 1111(b) claim enables a creditor like KPERS to ensure that § 1129(a)(8) is not satisfied by complete acceptance of the plan and thus invoke the protection of the absolute priority rule for unsecured claims, contained in § 1129(b)(2)(B). This right is hardly meaningless.

Finally, the Court notes that § 1111(b) was created in response to the possibility under pre-Code law that undersecured nonrecourse creditors could be "cashed out" by being paid only the judicially-determined value of their collateral and losing their nonrecourse unsecured claims, while old equity holders retained their interests. *See In re Pine Gate Associates, Ltd., 2 Bankr.Ct.Dec. 1478 (deciding such cash out was permissible) and 3 B.C.D. 301 (valuing property) (N.D.Ga.1977); the bankruptcy court decisions were apparently affirmed by the district court in an unpublished decision cited in S.Rep. No. 989, 95th Cong., 2d Sess. 65 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5851.* As explained more fully in a leading treatise, the purpose of treating nonrecourse claims as if they had recourse under § 1111(b) was to give an undersecured nonrecourse creditor a share in the distributions to unsecured creditors, *5 Collier on Bankruptcy ¶ 1111.02 (15th ed. 1994),*[2] not to give it the ability to block approval of an otherwise confirmable plan. *In re Triple R Holdings, L.P.,* 134 B.R. 382, 389 (Bankr.N.D.Cal.1991).

## II. IMPAIRMENT

### A. Additional Facts About Impairment

■■■■ Amigo is the prime tenant of the Mart, and its intent to lease the premises was the reason the Mart was built. Although it has been able to pay the base rent, Amigo has not been able to make certain other payments required under the lease as initially drawn and as subsequently modified by the parties. During the lease term, Amigo has also incurred other obligations to the debtor which it had not paid by the day the debtor filed its chapter 11. Conversely, Amigo claims the debtor owed it a debt on the filing date and, at least to the extent that the debt is for utilities Amigo paid that are actually the debtor's obligation, the debtor admits the debt is owed. The utility debt arose because under one of the lease modifications, Amigo surrendered occupancy of part of the Mart and the debtor was supposed to arrange for the utilities for different parts of the Mart to be separately metered so Amigo

---

**2.** The text in this paragraph quotes a proposed provision and labels it as "§ 1129(d)" rather than "§ 1131" as it is labelled in the reprint of the bill that contained it, *Appendix 3 Collier on Bankruptcy, § VII, pp. 539–40 (15th ed. 1993).*

However, the reference is clearly to the provision that was deleted in light of the protection §§ 1129(b) and 1111(b) gave to undersecured nonrecourse creditors.

would pay for only its use of utilities. The debtor had separate internal meters installed but failed to arrange for separate billings, so Amigo continued to be responsible to the utility company for the full bill. Amigo then billed the debtor for its share, but the debtor has not paid all its prepetition obligation. Of course, but for their agreement to form a new lease, the debtor's rejection of the old lease would give Amigo the rights specified in § 365(h).

The debtor's plan proposes a mutual forgiveness of debts between Amigo and the debtor, rejection of the present lease, and the creation of a new lease. The term of the new lease would be 25 years instead of the 13 remaining under the old lease. Amigo would no longer be obliged to make certain payments in addition to the base rent it had owed under the old lease. The lease terms are generally more favorable to Amigo, particularly in the near future, than under the old lease. Since Amigo was unable prepetition to pay all the amounts required under the old lease, the new lease makes it a more viable tenant. The evidence indicated it would be difficult, if not impossible, for the debtor to find a tenant to replace Amigo. The new lease also frees the debtor from making an estimated $4 million dollars worth of renovations which would have been necessary at the end of the term of the old lease.

### B. Discussion and Conclusions About Impairment

KPERS argues that since the new lease is demonstrably more beneficial to Amigo than the old lease in terms of cash paid to the Mart, the impairment of Amigo's claim is artificial and imposed only to gain an accepting vote. Since the recourse unsecured creditors are impaired and have accepted the debtor's plan, the Court's ruling that the debtor could properly classify them separately from KPERS' nonrecourse unsecured claim has made this issue essentially irrelevant. The Court will spend little time on it.

While the new lease does benefit Amigo, it also benefits the debtor. Without Amigo, the Mart would have no prime tenant and no proven prospects of obtaining another. Amigo did not make some substantial payments required under the old lease, but the debtor believes this is because the Mart simply does not generate the revenue the parties originally envisioned. By entering into the new lease, the debtor will be able to retain its primary tenant, along with the substantial cash flow that was formerly the base rent, and also rid itself of a renovation obligation thirteen years down the road which, even discounted to present value, would be substantial. The debtor seems to have good business reasons to treat Amigo's claim and lease as it proposes to do. *See Greystone,* 995 F.2d 1274; *In the Matter of Briscoe Enterprises, Ltd., II,* 994 F.2d 1160 (5th Cir. 1993). The treatment is unique and would require a separate classification. Pursuant to § 553 and § 506(a), a portion of the Amigo claim is secured due to its right of setoff and, absent Amigo's agreement, would have to be separately classified.

### III. IMPAIRED CLASS ACCEPTANCE

Since the recourse unsecured creditors have accepted the plan, the Court's ruling that the debtor could properly place them in a class by themselves means at least one impaired class has accepted the plan. Since Amigo has also accepted the plan, the Court's further conclusions that Amigo's separate classification was justified, it was impaired, and its impairment was not improper gerrymandering means another impaired class has accepted it. The requirement of § 1129(a)(10) that at least one impaired class accept the plan has therefore been satisfied.

### IV. INTEREST RATE

#### A. Additional Facts About Interest Rate

The debtor proposes to amortize KPERS' secured claim over 25 years at 7.5% interest or at a market rate determined by the Court based on the evidence presented. The amount to be amortized equals the value of the collateral, $16,268,900. The witnesses did not agree on a specific interest rate that would be appropriate for this case, and none of them suggested 7.5% was the present market rate.

The debtor presented three witnesses and KPERS one on the interest rate question. The Court will summarize its understanding

of their testimony, beginning with the debtor's witnesses.

Richard Noon, a mortgage banker with 25 years experience, stated that he knew of no lenders willing to make a new commercial real estate loan for 100% of the value of the property. In his experience over the last few years, lenders who had become owners of property through foreclosure which they then sold and financed made their sale loans at interest rates ranging between 6.75% and 8%. In the industry, lenders refer to such a sale loan as an "REO" (though no one said as much, the Court believes this acronym comes from the phrase "Real Estate Owned"). Mr. Noon indicated a "noncredit borrower" (any borrower other than a Fortune–500–type company or similarly flush individual) seeking a loan to buy an industrial or retail property, with a down payment of 20 to 25% of the property's value, an expected income-to-debt-service ratio of 1.2 or higher, and a 20– to 25–year loan term, could obtain a loan at an interest rate of 200 to 250 basis points above the same-term treasury instrument. His survey of loan workout situations in the Kansas City area disclosed interest rates in the 7 to 8% range. He explained that loan workouts and REO sales are generally made at lower interest rates because the properties' incomes do not support a higher rate and the lenders wish to cure troubled loans or dispose of property they own. Because its structure limits the kinds of businesses that can use it, the Mart is a "special use property," and Mr. Noon was unable to find an example of a recent financing of a comparable structure and knew of no special rate applicable to such a property. He indicated he felt this case was more like a workout or REO than a completely new loan because KPERS already has a loan outstanding, and so the appropriate loan market to review for interest rates would be the workout or REO market. A structure that is primarily a special use building, he indicated, is more risky for a lender than, say, a general-purpose office building, implying the interest rate should be in the upper end of the range of basis points above a base rate, such as New York prime or treasury instrument rates. He believes a rate of 7.5% would be adequate for the Mart as a troubled property, but would not be adequate otherwise. Although he personally was unaware of any special purpose loans made, he relied on some of the data in Exhibit 38 in arriving at his conclusions. Exhibit 38 is the January 1994 Investment Bulletin published by the American Council of Life Insurance which reports the results of a survey of interest rates given in recent loans and includes special use or special purpose loans under the category "Other Commercial." The exhibit reports that 6 loans in the "Other Commercial" category were made in the first three quarters of 1993, with interest rates ranging from 6.75 to 9.50% and terms ranging from 10.67 to 13.67 years, with an average of 12 years and 2 months.

Jack M. Reda, a CPA who holds a securities license and has been involved in corporate finance and investment banking, was also unaware of any new loans being made at a 100% loan-to-value ratio, and indicated that a 70 to 75% loan-to-value ratio was generally required for such loans. He believes that, on a new loan, a noncredit borrower would be charged 250 to 300 basis points over the current rates paid on United States Treasury instruments and a credit borrower something less. He then testified that he had made an analysis of the Consumer Price Index for the last 25 years to track changes in the rate of inflation. His study determined that the average annual inflation rate for the period was 5.88%. Thus, to keep even with or a little ahead of inflation, one who wished to preserve the original value of a principal amount would have had to receive a return of at least 5.88% over the 25 years. In the mortgage loan context, this means that the stream of payments made over those years on any instrument that was amortizing the principal owed would have to have included interest of at least 5.88% annually to retain its original present value. He further stated that it is generally accepted that even rates for treasury instruments contain 100 basis points of real return above inflation and cost. He then analyzed the debtor's mortgage and note with KPERS, and determined that the original loan yield was 11.33% while the applicable treasury rate at the time was 9.59%, meaning KPERS obtained an interest cush-

ion of 174 basis points. The current rate on the same treasury instrument was stated to be 6.84%. Mr. Reda thus indicated a market rate for KPERS could range from 8.58% (6.84% + 174 basis points) to 9.84% (6.84% + 300 basis points).

Thomas Slack, an MAI appraiser, testified that the debtor's projections of its future income were extremely conservative and that repayment of KPERS' secured claim was very likely to be achieved at an interest rate of 7.5% and that, in KPERS' position, he would still feel safe at about 8.5%. He indicated the income-to-debt-service ratio at 7.5% would be at least 1.4. He believes the Mart will produce better results than projected because it is in one of the best locations in the heart of the fastest-growing part of the Kansas City area, if not the region. He further believes that as years pass and the debtor continues to operate, KPERS' risk of nonpayment will decrease because of the property's location, the cash flow it will likely generate, and the reduction in KPERS' principal as the debtor makes its payments.

KPERS' witness, Michael Vick, a CPA and appraiser, asserted that an interest rate of 17% would be appropriate in this case. He based his opinion primarily on his experience with the Resolution Trust Corporation's (RTC) sales of loans held by failed savings and loans which it had taken over, and conversations with lenders concerning what they might charge for making a loan on a special use building. The sales he relied on were RTC sales of 10 or more loans as a group. The groups would contain loans of varying quality, some which bidders would buy individually and some which they would not. However, they could buy the loans as a group or not at all. The rate of return, or interest rate, for any particular loan in such a group was then computed by adding the average discount from the face amount of all the loans to the average interest rate of all the loans. The actual interest rates paid by the borrowers whose loans were purchased were, of course, unaffected by the transaction. This average rate of return would be inflated to the extent buyers feared loans included in the group would not be repaid. None of the people Mr. Vick spoke to about

new loans on special use buildings had actually made any such loans recently. He said these people advised him that a standard loan might be made for 390 basis points above the rate for a like-term treasury instrument. Because he knew a 100% loan-to-value ratio loan would not be made in the market place, Mr. Vick added basis points to this standard loan figure to arrive at his suggested interest rate in the instant case. He did not obtain any figures from the borrower side of the interest rate market. He believed the rate of 200 to 300 basis points above the rate for treasury securities that the other witnesses mentioned was inapplicable to special purpose loans. Mr. Vick said that a standard loan would be made for between 10 and 11% and that such a return would satisfy the present value requirement of the Bankruptcy Code. He also stated that if a creditor actually received all required payments at an interest rate higher than the 10 to 11%, it would receive more than the present value of its claim. He indicated that a lender who makes a loan on a high risk property is entitled to a high reward if the loan is successful. Thus, if the loan pays out, the lender receives a greater profit.

## B. Discussion and Conclusions About Interest Rate

In *In re Hardzog*, 901 F.2d 858 (10th Cir.1990), the Tenth Circuit ruled that § 1225(a)(5)(B)(ii) requires a reorganization plan to pay secured creditors a market rate of interest for similar loans in the region to provide them with the present value of their claims. The Circuit noted that other Code sections also impose a present value requirement, including § 1129(b)(2)(A)(i)(II). In the reorganization chapters, claims are secured only to the extent of the value of the property securing them. Since *Hardzog* was decided, this Court has been told in every case involving a present value question that no market exists for loans of 100% of the value of a piece of property, making the proper determination of *Hardzog's* "market rate" less than clear. Creditors generally attempt to fabricate an interest rate based on: (1) the return which investors in the reorganized debtor would demand, or (2) an amalgam of interest rates actually charged for loans that

are being made, to the extent of some percentage of the property's value, plus the return equity investors would expect, for the balance of the theoretical "loan." As in this case, these methods usually show that to obtain 100% financing, a debtor must pay such a high rate of interest that it could not make the payments on the "loan." On the other hand, if the interest rate is set at some rate actually being charged on loans that are being made, the debtor might well be able to pay the secured claim and provide some return to its unsecured creditors. Debtors, naturally, generally attempt to establish an interest rate which will allow their cash flow to service the secured debt, sometimes proffering a rate below any available in the market place for a standard loan.

In this case, the debtor's plan proposes to pay 7.5% interest on its secured obligation to KPERS, which the Mart's cash flow will easily enable the debtor to pay, but also provides that if the Court concludes a higher interest rate is required, the plan will adjust to pay that rate to KPERS. The debtor's projections of available cash are conservative. In fact, the appraisers for both sides agreed on this point and based their estimates of the Mart's value on a higher cash flow than the debtor projected. The Court, in turn, based its finding of the Mart's value on their testimony. Consequently, the Court concludes that the debtor's cash flow will be at least as much as the debtor has projected.

■ The Court notes it has been persuasively suggested that a literal reading of the language Congress used in § 1129(b), requiring that dissenting creditors must be paid the full present value of their claims if junior parties are to receive anything under a reorganization plan, would indicate that the plan must pay interest at a rate that includes only the real rate of interest plus anticipated inflation over the period of repayment, and does not include the risk premium and profit for the creditor that are included in market rates. *Creel & Patterson, "Back to the Basics: A Novel Approach for Determining the Property Discount Rate in Cramdown," Norton Bankruptcy Law Adviser, May 1992, No. 5, at 4–5 (Clark Boardman Callaghan, pub.).* Nevertheless, as those authors recog-

nize, most courts have instead looked for the kind of market interest rate which includes risk and profit as the one that must be paid. These include one that this Court is bound to follow, and so in determining the rate of interest which the debtor must pay in this case, the Court has kept in mind that the Tenth Circuit's *Hardzog* decision dictates the use of such a "market rate." In addition, the Bankruptcy Code requires that the value of the stream of payments to the creditor equal the present value of its secured claim, and that the debtor not pay more than 100% to any creditors, at least when junior claimants like the equity holders are not retaining their interests in the debtor. These requirements are either specified in or implied by § 1129(b). *See § 1129(b)(2)(A)(i)(II); HR Rep. No. 595, 95th Cong., 1st Sess. 413–18 (1977), reprinted in 1978 U.S.C.C.A.N. 6369–74.* Finally, the Court is aware that the *Hardzog* decision reviewed and rejected as a generally applicable standard the ruling of *United States v. Doud,* 869 F.2d 1144 (8th Cir.1989), in which the court decided that the "market rate" should be determined by finding a riskless rate, such as that for treasury bonds, and adding basis points to compensate for the risks involved. The Tenth Circuit stated that the *Doud* formula was "a simplified and easy method of interest rate determination" but would "probably not accurately reflect the market." 901 F.2d at 860.

According to the evidence, over the debtor's proposed 25–year payout on the secured claim, KPERS would receive the present value of that claim if it is paid principal plus a rate of interest that is likely to equal the Consumer Price Index (CPI) over that period. The CPI is used as a measure of the rate of inflation, and according to Mr. Reda, it averaged 5.88% per year over the last 25 years. Assuming past to be prologue, 5.88% should protect KPERS from any loss due to inflation over the payment period. This establishes a floor below which no reasonable "market rate" should fall. The original loan was made at 174 basis points above the comparable-term treasury security, and presumably somewhat more than that above the then-projected CPI. Any increase over that spread would generate a greater margin over inflation than KPERS originally obtained.

Mr. Reda stated that a noncredit loan of this nature would be made at a rate up to 300 basis points above that for comparable treasury securities. Mr. Noon testified that a standard loan would be made at 200 to 250 basis points over the rate for comparable treasury securities while Mr. Vick said the rate would be 390 points over it. Mr. Vick's estimate came from his experience with RTC sales of groups of loans and from estimates provided by lenders who had not recently made any loans like this one. He also was not aware of any published data about interest rates for special purpose loans. Mr. Vick conceded that if all the payments were made over the life of a loan, a borrower that paid the interest rate currently being charged in the market for standard loans would provide its lender the equivalent of full payment today. He further stated that a loan which paid the lender more than the standard-loan interest rate would give the lender more than the equivalent of full payment today. In essence, he stated that a high-risk, high-interest-rate loan rewards the lender with a larger profit than a standard loan. Of course, this is not a novel concept. The Court must question, however, whether it comports with the requirements of the Bankruptcy Code.

Is the purpose of chapter 11 to allow the reorganization of ailing debtors who have sufficient income to pay their secured debts and provide some payment to their unsecured creditors, or is it to terminate all debtors whose assets are fully encumbered regardless of the cash flow they can generate to pay on their debts? KPERS admits this debtor has a conservatively-estimated cash flow which, at 7.5% interest and possibly as much as 9% or slightly higher, would permit it to pay its secured obligation, set aside money so it can weather future financial mishaps, and still have some money or, at least in the future, develop equity in the Mart that can be distributed to its former unsecured creditors who will be its equity holders under the plan. Though the debtor's assets are fully encumbered (except for the preference recoveries)—in other words, it is 100% leveraged—its projected income-to-debt-service ratio at 7.5% interest is a minimum of 1.4, at least 20% higher than the minimum requirement for standard loans, and could easily turn out to be higher.

Under KPERS' theory on interest rates, since the debtor is 100% leveraged, it should be required to pay a rate that would pay KPERS on its secured claim more than enough to keep its return ahead of inflation and that would pay no return to its unsecured creditors, even though KPERS is in that group. Besides not allowing anything to be paid to unsecured creditors, KPERS theory would require the debtor to pay interest at a rate that would give KPERS a return of more than 100% of the present value of its secured claim, in violation of § 1129(b). The Court concludes this cannot be the "market rate" that *Hardzog* requires.

The more credible testimony in this case established a number of requirements for a current market rate of interest. The base rate of return should keep KPERS ahead of the predicted average rate of inflation for the term of the proposed amortization period. The 174–point spread between treasury rates and the contract rate shows the cushion for risk that KPERS was willing to accept at the inception of its original loan. Neither of these matters, however, fixes the market rate nor were they so intended. The rate for a standard loan of this type is somewhere between 200 and 390 basis points above a like-term treasury instrument. Finally, a return in excess of the standard loan rate merely includes additional profit to compensate for the risk taken, and if all payments are made, will net the recipient more money than it would have received at the rate for a standard loan. The standard loan rate already includes adjustments for profit and risk. The Court notes that the evidence in this case, as presented by both sides, is contrary to the opinion expressed in *Hardzog* that the market would not generally be reflected this way, and points to a formula very similar to that used by the bankruptcy court in *In re Doud*, 74 B.R. 865, 868–70 (Bankr. S.D.Iowa 1987), and approved by the Eighth Circuit, *United States v. Doud*, 869 F.2d 1144, 1145–46 (8th Cir.1989).

 In order to comply with the Bankruptcy Code and *Hardzog*, the Court believes

a plan must pay interest at a rate that is equal to a standard rate given in an easily ascertained market and that does not return more than 100% to its recipient. A chapter 11 plan like this one does not involve a new loan being made by a stranger to the case, but an adjustment to the rights of a creditor who is already owed money by a troubled enterprise. In this case, the debtor's cash flow from the beginning was so inadequate to service KPERS' loan that related entities and others had to lend the debtor about $2,000,000 a year to enable it to make payments to KPERS and to stay relatively current on its other ongoing operational payments. Though no witness actually said this, it is clear that an appraisal based on the capitalized cash flow of the property, done shortly after the Mart commenced operations, would have indicated a value of substantially less than the amount of the loan.

■ The Court is not required to determine whether KPERS would now make such a loan, knowing its troubled history, but what interest rate is appropriate for a "loan" which the Court must separately determine to be feasible. Under § 1129(a)(11), the Court must determine whether the post-confirmation debtor would be likely to revisit chapter 11 or chapter 7, that is, whether the plan is feasible. If the Court determines that the plan meets all the other tests of § 1129(a) but has one or more dissenting classes of impaired creditors, a financially viable entity will have been established, and the plan proponent can ask the Court to review the plan for compliance with the tests in § 1129(b). The separate feasibility determination, then, should qualify the debtor for a standard, actual market rate, not some hypothetical rate invented for a "loan" which would not be made in the market place. The only Congressional comment which the Court has found on the issue of interest in the legislative history of the Code is:

"Normally, the interest rate used in the plan will be prima facie evidence of the discount rate because the interest rate will reflect an arms length determination of the risk of the security involved and feasibility considerations will tend to understate interest payments."

H.R.Rep. No. 595, 95th Cong., 1st Sess. 415 (1977), reprinted in 1978 U.S.C.C.A.N. 6371. This comment, which assumes interest rates will be set by debtor-creditor agreement, lends some support to Mr. Noon's opinion that the workout or REO rate should be applied in this case.

■ The Mart, KPERS' security, has little or no present risk of declining in value; instead, it is likely to increase in value due to its advantageous location. The plan projects cash flows more than sufficient to make the proposed amortizing payments to KPERS at an interest rate higher than that needed to keep pace with projected inflation (as shown by the past CPI) and higher than the difference between the rates for treasury instruments and the interest rate KPERS accepted when it first made the loan.

Having considered the evidence, the Court adopts 9.5% as the appropriate interest rate in this case at this time, which is within the range of rates proposed by Mr. Noon and Mr. Reda, and is approximately 250 basis points above the comparable-term treasury instrument. The Court has made an adjustment in reaching this figure which has not been mentioned previously. The debtor's proposed plan calls for monthly payments that will not only pay interest on KPERS' secured claim but also amortize the principal balance owed, while government securities pay interest-only until their maturity date and then pay the principal in full. Consequently, in order to locate the appropriate treasury interest rate, the Court calculated the average outstanding principal balance and divided that by the full principal to determine the average percentage of the claim that would remain outstanding over the full repayment term. The Court then multiplied the term of the repayment proposal by that percentage to arrive at the number of years to maturity of the government security that should reflect the riskless interest rate the government securities market has set for the debtor's proposed repayment term. *See Doud,* 74 B.R. at 868, *aff'd* 869 F.2d 1144; Carbiener, "Present Value in Bankruptcy: The Search for an Appropriate Cramdown Discount Rate," 32 S.D.L.Rev. 42, notes 195–202 and accompanying text (1987).

## V. LENGTH OF PAYOUT PERIOD

### A. Additional Facts About Length of Payout Period

 KPERS' original mortgage called for a 25-year amortization of the loan. The debtor's witnesses testified that a 25-year repayment period was at the outer edge of the terms of loans currently being made, but was still within the realm of reasonableness; generally, they said, current repayment terms are shorter. KPERS' witness testified that the term of the repayment period should be a maximum of 15 years. On Exhibit 38, the American Council of Life Insurance January 1994 Investment Bulletin, the average length of the most recent loans in the "Other Commercial" category, which includes merchandise marts, is 12 years and two months. Since the plan proposes amortizing KPERS' secured claim, as the years pass, the principal balance will decrease and make the risk of loss on default less so long as the value of the Mart stays the same or increases, as the evidence indicated it should. Instead, the added risk to KPERS of a longer repayment term is the increased possibility that interest rates will increase so that the payments it would receive under the plan will not equal the present value of its claim. The original loan had a spread of 174 basis points over the same-term treasury instrument. At 9.5%, the current spread is 250 basis points. The spread over the 25-year CPI average is 362 points.

### B. Discussion and Conclusions About Length of Payout Period

A 25-year term is at the outer limit of the current market, and is about twice the average length of the most recent relevant loans shown on Exhibit 38. The original term of the loan was 25 years. At 9.5% interest, the spread above the rate for government securities and the 25-year CPI average is substantially greater than it was for the original loan. As the term progresses, KPERS' protection against loss grows with the increase in the debtor's equity in the property. Though the term is longer than most loans in the current market, it is within the outer limit of the range of loans made and is the same as the original loan term. In fact, to reduce the loan term to the average would reduce the original term by about five years. A 25-year term does not violate the Code in this case.

## VI. FEASIBILITY

### A. Additional Facts About Feasibility

 Except for the appropriate interest rate and length of payout for KPERS' secured claim, the material facts pertaining to feasibility were undisputed at the confirmation hearing. Applying the 9.5% interest rate arrived at above, the Court recomputed the payments to be made to KPERS under the plan, and finds they would be $142,141 per month or $1,705,690 per year over the 25-year term. The Court has not reworked all the figures provided but has reviewed KPERS' Exhibits 5 and 6. In at least the years 2001 and 2012, the debtor projects insufficient cash flow to make such payments to KPERS without material changes in the lines "alterations," "capital reserves," and "special reserves" which appear below the "Net Operating Income" line on those exhibits. The increased payments to KPERS also substantially change the net cash flow, which is the figure the unsecured creditors would look to for payment through distributions to them as new limited partners. In addition, the net-operating-income-to-debt-service ratio falls below 1.15 in several of the early plan years.

### B. Discussion and Conclusions About Feasibility

The debtor's plan is not feasible because, as presently set out in the exhibits, the cash flow is insufficient to make all the required payments. Since the debtor's income projections were more conservative than either side's appraiser used to determine the value of the Mart and there is not yet a final bid for the general partner share of the post-confirmation debtor, the Court cannot say that the debtor is unable to reorganize but only that the present plan cannot be confirmed.

## VII. ABSOLUTE PRIORITY

### A. Additional Facts About Absolute Priority

KPERS contends that the debtor's plan violates the absolute priority rule as inter-

preted by this Court in *In re Drimmel,* 108 B.R. 284 (Bankr.D.Kan.1989), *aff'd* 135 B.R. 410 (D.Kan.1991), *aff'd sub nom. Unruh v. Rushville State Bank,* 987 F.2d 1506 (10th Cir.1993). Under the plan, the former partners' shares would be cancelled, and new partner shares would be created. The new limited partner shares would be divided pro rata among the unsecured creditors. KPERS is said to be entitled to 60% of the limited partner shares, but after the plan was filed, the Court determined that the amount of KPERS' postpetition payment of prepetition taxes should be added to its claim, so KPERS' share would now be about 62%. The remaining limited partner shares would go to the related and possible-insider entities who loaned the debtor over $12,000,000 during a six-year period before the bankruptcy filing, subject to their agreement to direct their distributions to the trade creditors until they are paid in full. The limited partner shares comprise 75% of the new partnership. The remaining 25% would be sold to a new general partner through an auction process.

The process for selling the general partner share included two significant provisions affecting who might want to bid. First, interested parties were required to make a $100,-000 good faith deposit into escrow by a specified date to qualify to participate in the auction. Second, $15,000 of each good faith deposit was to be forfeited if the debtor's plan was not confirmed or the depositor was not the successful bidder. The related entities and possible-insider entities joined together to make the only escrow deposit. All creditors were notified of the auction procedure, but it was not otherwise publicized in any official way. No one receiving the notice, however, was precluded from notifying others of the auction.

The debtor's plan calls for a recovery of possible preferences from those related entities and possible insiders. The entities would receive limited partner interests in the new debtor as payment of their claims. The possible preferences to them are valued at $375,881. As indicated, they have agreed to assign their right to distributions from the new debtor to the trade creditors until the latter's claims are paid in full. The balance of the preferences would then be recovered from subsequent distributions that would otherwise go to the related and possible-insider entities, and so would be given to KPERS, the only other limited partner. Thereafter, the related and possible-insider entities would receive their share of future distributions. The plan projects that distributions will be made to the limited partners beginning in the first year.

### B. Discussions and Conclusions About Absolute Priority

The former owners have no equity in the debtor. The debtor's assets do not exceed $17,000,000 while its liabilities approach $50,-000,000. The debtor's plan is to give some of the ownership to its creditors and some to a new investor/risk taker. No express reason has been given for making the limited partner shares equal 75% of the total post-confirmation ownership. The Court can infer that this was done to make it possible for the buyer of the general partner share to obtain control of the partnership if it was bought by either KPERS or the related and possible-insider entities. In order to encourage bidding by those most likely to be interested and willing to pay the best price, control must be offered; otherwise, fewer parties would be likely to bid, and the share would be less likely to sell for its full value. *See Case v. Los Angeles Lumber Products Co.,* 308 U.S. 106, 121 n. 15, 60 S.Ct. 1, 84 L.Ed. 110 (1939) *(the stockholders may be " 'the only or most feasible source of the new capital,' " quoting In re Dutch Woodcraft Shops,* 14 F.Supp. 467, 471 (W.D.Mich.1935); *In re Bjolmes Realty Trust,* 134 B.R. 1000, 1010 (Bankr.D.Mass.1991).

▬ The debtor offered little explanation of the good faith deposit requirement, and even less of the forfeiture provision. The Court can infer the deposit insures the bidders are truly serious and have sufficient cash available to make a real offer. Whatever considerations produced the deposit amount were not disclosed. The debtor presented no evidence to justify including the $15,000 forfeiture provision in addition to the good faith deposit. Requiring the forfeiture even if the plan is not confirmed is especially

baffling. Perhaps it was included simply to create a conflict for KPERS by requiring it to invest money that would give it some interest in getting the plan confirmed when the debtor knew KPERS would almost certainly oppose confirmation. The Court can think of no justification for the forfeiture.

■ In any event, the Court concludes that the minimum bid, which is the $100,000 deposit, is insufficient. Since, in essence, the estate is recovering preferences in the amount of $375,881 and, as events unfolded, would receive only $100,000 from the auction, the post-confirmation estate would contain $475,881 in what the Court believes are unencumbered assets. The general partner share would be worth at least one quarter of this amount, so, by paying $100,000, the general partner would become the owner of a share valued in cash at $118,970.25, and would be entitled to receive that amount if the new debtor were liquidated immediately after confirmation. Thus, taking only cash into consideration, the general partner share cannot be sold for less than that amount.

■ Although the debtor's proposed auction fails for other reasons, the Court does not agree with KPERS' argument that the auction violates the absolute priority rule by giving an interest to junior parties despite the existence of senior parties that are not being paid in full. The old equity interests would retain nothing under the plan on account of their prior interests. *See In re Bjolmes Realty Trust,* 134 B.R. 1000, 1008–12 (Bankr.D.Mass.1991). The fact that former partners may be among the successful bidders is as irrelevant as the fact that former creditors may be among the successful bidders. The parties were all given the opportunity to bid for the new share. The plan united two opposing factions who hold nearly all the unsecured claims against the debtor and, through an auction, offered each a sufficient share of the ownership of the post-confirmation debtor, in the form of a general partner share, to give it control of the entity. Each side was given the opportunity to bid the minimum amount necessary to obtain a controlling interest. Third parties could have entered the auction, but would have had to form an alliance with one of the factions

holding limited partner shares to insure continuing as the managing agent of the new partnership. Had the auction been otherwise acceptable and the plan been otherwise confirmable, the Court would not have denied confirmation on absolute priority grounds.

## VIII. SUMMARY OF CONCLUSIONS

For the reasons stated, the Court concludes the debtor's plan cannot be confirmed as proposed. A nonrecourse undersecured creditor's § 1111(b) unsecured claim not only can but must be classified separately from the claims of recourse unsecured creditors. Amigo's claim against the debtor was legitimately impaired and was appropriately separately classified under the plan. These rulings resulted in two impaired classes that accepted the plan, so § 1129(a)(10) was satisfied. The evidence established that the proper interest rate to be paid on KPERS' secured claims would be the current rate on an appropriate-term treasury security plus somewhere between 174 and 300 basis points, a rate the Court determined to be 9.5% as of the date of this decision. The 25–year payout term for KPERS' secured claim is fairly long, but acceptable in this case. The higher interest rate found to be applicable makes the plan not feasible under the debtor's present income projections. The proposed auction of the general partner share in the post-confirmation debtor would not violate the absolute priority rule; however, the minimum bid was set too low and the provision for the forfeiture of part of the good faith deposit was not justified.

The foregoing constitutes Findings of Fact and Conclusions of Law under Rule 7052 of the Federal Rules of Bankruptcy Procedure and Rule 52(a) of the Federal Rules of Civil Procedure. A judgment based on this ruling will be entered on a separate document as required by FRBP 9021 and FRCP 58.